**[Cite as *In re D.R.*, 2025-Ohio-2839.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| D.R. | : | No. 23AP-748 |
| | | (C.P.C. No. 18JU-012667) |
| (T.R., Father, | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

---

D E C I S I O N

Rendered on August 12, 2025

---

**On brief:** *Mitchell A. Williams*, Public Defender, and *Leon J. Sinoff* for appellant. **Argued**: *Leon J. Sinoff*.

**On brief:** *Robert J. McClaren* for Franklin County Children Services. **Argued**: *Robert J. McClaren*.

**On brief:** *William T. Cramer*, for appellee F.B.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1}  Appellant, T.R., father of D.R., appeals from a decision and entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating his parental rights and placing D.R. in the permanent custody of appellee, Franklin County Children Services ("FCCS").  For the following reasons, we reverse.

## I.  Facts and Procedural History

{¶ 2}  This matter is before this court on appeal from the decision and judgment entry issued by the trial court following our remand of the matter in *In re D.R.*, 2023-Ohio-

539 (10th Dist.). In our decision in *D.R.*, we set forth the facts and procedural history of this case. We stated:

> D.R. was born April 23, 2012. D.R.'s mother, F.B., and father were married at the time of D.R.'s birth but subsequently divorced. D.R. lived primarily with mother following the divorce and had visitation with father on weekends. On August 2, 2018, FCCS filed a complaint alleging D.R. was an abused, neglected, and dependent child. On October 31, 2018, FCCS dismissed and refiled the complaint alleging D.R. was an abused, neglected, and dependent child.
>
> FCCS initially received a referral regarding D.R. on July 10, 2018, following a domestic violence incident in D.R.'s home. A police report from the incident indicated that D.W., mother's live-in boyfriend and the father of mother's son J.W., choked mother and threw D.R. to the floor causing D.R. to hit a coffee table. D.R. had visible bruising on his body following the incident. FCCS also discovered that D.R. had numerous absences from school and was dirty when present at school. On October 31, 2018, the court granted FCCS a temporary order of protective supervision over D.R. and J.W. and ordered that D.W. have no contact with D.R.
>
> On November 16, 2018, following a second domestic violence incident involving D.W., D.R., and mother, FCCS removed D.R. and J.W. from mother's care pursuant to an emergency care order. FCCS initially placed D.R. and J.W. in the home of J.W.'s paternal grandmother, but removed the children a few days later at the grandmother's request and placed the children in a foster home in Coshocton, Ohio. Mother gave birth to another child, A.W., on December 1, 2018. The trial court granted FCCS temporary custody of A.W. after his birth, and the agency eventually placed A.W. in the same foster home as D.R. and J.W.
>
> On February 4, 2019, the trial court adjudicated D.R. abused, dismissed the remaining causes of action in the complaint, ordered temporary custody of D.R. to FCCS, and adopted a case plan. The case plan required father to complete random drug screens, complete an alcohol and other drug assessment and comply with any recommendations, comply with recommendations for his mental health, attain his own safe and stable housing, meet with the FCCS caseworker monthly, and meet D.R.'s basic needs. The case plan also contained requirements for mother.

On August 25, 2019, the trial court granted FCCS an extension of the temporary custody order. On February 19, 2020, the trial court granted FCCS a second and final extension of the temporary custody order. FCCS filed a motion for permanent custody on July 1, 2020.

D.R.'s guardian ad litem ("GAL") reported that D.R. exhibited serious behavior problems and low academic performance at school while in mother's care. After FCCS placed D.R. in the foster home, D.R.'s academic performance gradually improved but D.R. continued to exhibit behavioral concerns. Following troubling incidents in summer 2020, the foster family enrolled D.R. in counseling and implemented a safety plan for D.R. in their home.

Mother initially complied with several aspects of her case plan and had an unsupervised weekend visit with the children in March 2019. However, mother permitted D.W. to be in the home with D.R. in violation of the no contact order during the March 2019 visit, and FCCS terminated mother's weekend visits. Mother informed the agency that the allegations of domestic violence against D.W. were false and that she would not keep the children away from D.W. When FCCS filed the motion for permanent custody, mother informed the court she would not contest the motion.

Father was homeless throughout the first year and one-half of the case and did not have contact with D.R., the GAL, or the agency during that time. In fall 2020, father began to have phone contact with D.R. and participate in case-related services. Father lived with his grandparents for a few months in 2020 and lived in an extended stay hotel for the following year. Father continually informed the GAL throughout 2020 and 2021 that he expected to receive housing through an organization called Maryhaven Outreach "within a few weeks." (Nov. 19, 2020 GAL report at 13.)

On May 24, 2021, a trial on the agency's motion for permanent custody commenced before Judge Terri Jamison. The agency presented its case-in-chief and rested. Father testified on his own behalf and the court continued the trial before FCCS crossexamined father. The trial resumed before Judge Jamison on June 4, 2021, but the proceeding stopped when father informed the court he was sick. The trial again resumed before Judge Jamison on June 28, 2021, and father stated that

he expected to receive housing through Maryhaven by July 1, 2021. Following father's statement, the court had a discussion with counsel off record and then sustained father's motion for a continuance "to allow for father to complete his case plan objective of housing." (June 28, 2021 Tr. at 10.)

On October 25, 2021, the trial resumed before Judge Dana Preisse.[] FCCS presented its case-in-chief, and father and mother both testified on their own behalf at trial.

Father informed the court that he moved into a one-bedroom apartment in either late August or early September 2021, which had been leased by father's relative who passed away. Father stated that the landlord would permit him to sign a lease for the apartment on November 1, 2021, if father could pay the first month's rent and a deposit totaling $1,000 by that date. Although father only had $300, he hoped to receive assistance from either a family member or Maryhaven to cover the remaining portion of the payment.

Father informed the court that, if D.R. lived with him, D.R. would sleep in the bedroom of the apartment and father and his fiancée would sleep in the living room. Father did not have custody of his other child, six-year-old L., but would have overnight visits with her. Father stated that during L.'s visits, D.R. would sleep in the bedroom and L. would sleep in the living room with father and his fiancée.

Father suffered from post-traumatic stress disorder, bipolar disorder, and a seizure disorder. Father completed a mental health assessment in April 2021 which recommended that he complete "[s]ix months of [counseling sessions] at least once a month." (Oct. 25, 2021 Tr. at 38-39.) Father did not attend counseling sessions for six consecutive months as recommended. Father was supposed to call in "on a daily basis" to see if he needed to report for a drug screen, but he did not call in regularly. (Oct. 25, 2021 Tr. at 61-62.) Father completed a total of five drug screens throughout the case; four were positive for marijuana. Father presented the medical marijuana card he obtained in June 2021 as an exhibit at trial.

Although father was scheduled to have weekly in-person visits with D.R., he saw D.R. only four or five times in-person throughout the case. Father had a virtual visit with D.R. in

March 2021 and had in-person visits with D.R. in April, May, and June 2021.

The FCCS caseworker testified that father was not compliant with the stable housing or mental health components of his case plan, and father was only minimally compliant with the random drug screen component of his case plan. The caseworker stated that D.R. was bonded with his foster parents and siblings in the foster home, and that D.R. was not bonded with father.

The GAL recommended granting the agency's motion for permanent custody. The GAL testified that D.R. had expressed in "clear" and "direct" terms consistently throughout the year before trial that he wanted to "remain with the foster family." (Oct. 25, 2021 Tr. at 113.) The GAL stated that D.R. had never expressed a desire to live with father and that D.R. did not appear strongly connected to father. Evidence presented at trial demonstrated that the foster home was interested in adopting D.R., J.W., and A.W.

Toward the end of trial, mother testified on her own behalf. Mother testified she did not want father to have custody of D.R. and that she believed father lived with his girlfriend and a man named I.K. Mother stated that both father and I.K. had criminal records and she presented information from their respective criminal cases as exhibits at trial. The exhibits demonstrated that father had convictions for burglary and attempted felonious assault, and that I.K. had convictions for gross sexual imposition and failure to verify current address.

On November 29, 2021, Judge Preisse issued a decision and judgment entry granting FCCS's motion for permanent custody and divesting father of his parental rights.

*D.R.*, 2023-Ohio-539, at ¶ 2-19.

{¶ 3}  Father appealed the November 29, 2021 decision and judgment entry ("first appeal"), but mother did not.  In his first appeal, father raised the following three assignments of error:

[I.] By Terminating [Father's] Parental Rights Based On a Factfinding Process Which Resulted in Egregiously Errant Factual Determinations About [Father's] Criminal Record, Including Falsely Identifying Him as a Sex Criminal and Kidnapper, The Juvenile Court Failed to Assure Reasonable

Factual Certainty for its Findings, and Denied [Father] His
Constitutional Rights to Due Process of Law and His
Fundamental Right to Parent His Child.

[II.] The Juvenile Court's Judgment Terminating [Father's]
Parental Rights Was Against the Manifest Weight of the
Evidence.

[III.] The Juvenile Court Violated [Father's] Constitutional
Rights to Due Process of Law, and to Court Processes that
Conform With Article IV, Section 5 of the Ohio
Constitution When a Successor Judge Disregarded the Prior
Trial Proceedings, Neither Reincorporating Them Nor
Granting a New Trial, and Instead Restarted Trial Anew as if
the Prior Proceedings Had Never Happened.

*D.R.* at ¶ 20. In our February 23, 2023 decision, this court determined the trial court made factual findings that were against the manifest weight of the evidence, including erroneous findings that father had convictions of kidnapping, gross sexual imposition, escape, and failure to register as a sex offender. *Id*. at ¶ 38-39. We thus sustained father's first assignment of error and sustained in part father's second assignment of error, rendering moot the remaining portion of father's second assignment of error and father's third assignment of error. Specifically, we stated:

Upon a thorough consideration of the record, and given the
seriousness of a trial court's decision to permanently terminate
a parent's custody of their child, we find the factual errors in
the trial court's judgment demonstrate that the judgment is not
supported by clear and convincing evidence. As such, we
sustain father's first assignment of error and sustain father's
second assignment of error in part, thereby rendering moot the
remaining contentions under father's second assignment of
error regarding compliance with his case plan
objectives. *See* App.R. 12(A)(1)(c). The judgment of the trial
court is reversed and the case remanded for the court to
properly analyze the R.C. 2151.414(D)(1) best interest factors in
light of the evidence contained in the record.

*Id*. at ¶ 39.

{¶ 4}   On remand to the trial court, the matter was assigned to Judge Douglas Nobles, the third juvenile court judge to preside over the permanent custody proceedings.[1] At a June 8, 2023 status conference, the trial court asked the parties to summarize the case status.  (June 8, 2023 Tr. at 4.)  The parties and GAL discussed whether a new trial was necessary and offered their positions to the trial court.  (June 8, 2023 Tr. at 4-16.)

{¶ 5}   On August 15, 2023, father filed a motion for an in-camera interview of D.R. Father stated the purpose of the in-camera interview was to allow D.R. to "communicate his wishes regarding custody and/or visitation."  (Aug. 15, 2023 Mot. at 2.)

{¶ 6}   The trial court conducted a second status conference on August 22, 2023.  At this second hearing, the attorney and GAL for D.R. both communicated to the trial court that D.R. wished to stay in his current placement.  (Aug. 22, 2023 Tr. at 5-6.)  Though counsel for D.R. indicated some visits had occurred between father and D.R., counsel for father noted there had been challenges coordinating visitation with the foster family and asked for additional time for visits to take place.  (Aug. 22, 2023 Tr. at 4, 8.)  Counsel for father noted the trial court still had not ruled on the motion for in-camera interview of D.R. and reiterated their position that the trial court should conduct a new trial.  (Aug. 22, 2023 Tr. at 8, 11.)  The trial court noted it needed to rule on whether to have a new trial, and stated:

> Give me a few minutes I want to - - and I'll call you guys back
> in and we'll figure out what we're doing next procedurally.  Give
> me five minutes 'cause (sic) I'm pretty stacked up.  Thank you.

(Aug. 22, 2023 Tr. at 11.)  At that point, the hearing transcript concludes, and the trial court did not return on the record.

{¶ 7}   Subsequently, on November 20, 2023, the trial court issued a decision and entry granting FCCS's motion for permanent custody.  The trial court did not conduct a new trial or evidentiary hearing.  Instead, the trial court stated it "reviewed relevant transcripts in this matter and has carefully reviewed the testimony and evidence presented, the entire file, and the applicable law."  (Nov. 20, 2023 Decision and Entry at 2.)  The trial court found

---

[1] Judge Nobles became a judge on the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch on January 13, 2023, having been elected to fill the seat of Judge Preisse upon her retirement.

D.R. "is thriving in a prospective adoptive home with his biological siblings which can provide the stability to meet his behavioral issues and mental health needs." (Nov. 20, 2023 Decision and Entry at 5.) Thus, the trial court determined it was in D.R.'s best interest to grant FCCS's motion for permanent custody, thereby terminating mother's and father's parental rights. When it issued its decision and entry, the trial court had not ruled on father's August 15, 2023 motion for an in-camera interview.

{¶ 8} Father timely appeals. Mother did not appeal but has filed a brief supporting FCCS's arguments.

## II. Assignments of Error

{¶ 9} Father raises the following four assignments of error for our review:

> [I.] The Juvenile Court Denied [father] His Constitutional Right to Due Process of Law, and His Fundamental Liberty Interest in the Care and Custody of His Child, When it Denied Him any Meaningful Opportunity to Dispute the Permanent Severance of His Parental Rights.
>
> [II.] The Juvenile Court's Determination that Permanent Custody of D.R. to FCCS was in D.R.'s Best Interest Was Not Supported By Clear and Convincing Evidence, and Was Against the Manifest Weight of the Evidence.
>
> [III.] The Juvenile Court Violated [father's] Constitutional Rights to Due Process of Law, and the Court Processes that Conform With Article IV, Section 5 of the Ohio Constitution, When a Successor Judge Neither Affirmed that it Incorporated the Portions of Trial Held in Front of a Prior Judge, Nor Ordered a New Trial.
>
> [IV.] The Trial Court Could Not Properly Weigh the Best Interest of the Child When it Awarded Permanent Custody to FCCS Without Considering [father's] Motion for an *in camera* Interview of D.R. to Ascertain the Child's Actual Wishes.

## III. Standard of Review and Applicable Law

{¶ 10} Parents have a constitutionally protected fundamental interest in the care, custody, and control of their children. *In re B.C.*, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990) (recognizing

the right to raise one's children is a basic and essential civil right). However, these rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979); *In re D.A.*, 2007-Ohio-1105, ¶ 11. In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the child's best interest. *D.A.* at ¶ 11, citing *Cunningham* at 105. Because termination of parental rights "has been described as 'the family law equivalent of the death penalty in a criminal case,' " parents " 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 11} R.C. 2151.414 governs the termination of parental rights. *In re K.H.*, 2008-Ohio-4825, ¶ 42. Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that: (1) one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies; and (2) it is in the best interest of the child to do so. *In re Z.C.*, 2023-Ohio-4703, ¶ 7. Clear and convincing evidence is the measure or degree of proof "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Clear and convincing evidence requires more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt as in criminal cases. *Id.*

{¶ 12} To determine the best interest of the child, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one

or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not assign any one factor "greater weight than the others." *In re Schaefer*, 2006-Ohio-5513, ¶ 56.

{¶ 13} An appellate court will not reverse a trial court's determination on a permanent custody motion unless it is not supported by the sufficiency of the evidence or it is against the manifest weight of the evidence, depending on the nature of the arguments presented by the parties. *See Z.C.* at ¶ 18 (rejecting use of the abuse of discretion standard in reviewing permanent custody determinations under R.C. 2151.414 and clarifying that separate standards for sufficiency and manifest weight of the evidence apply instead). The sufficiency of the evidence standard tests the adequacy of the evidence, and a court of appeals should affirm a trial court when the evidence, if believed, is legally sufficient to support the verdict as a matter of law. *Z.C.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The manifest weight of the evidence standard concerns the effect of the evidence in inducing belief. *Z.C.* at ¶ 13, citing *Thompkins* at 387. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. Furthermore, "although the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis, it should not be used as a substitute for the

separate      sufficiency      and manifest-weight analyses      appropriate      for permanent-custody determinations." *Id.* at ¶ 15.

## IV. First, Second, and Third Assignments of Error–Procedure on Remand

{¶ 14} Father's first, second, and third assignments of error are interrelated, and we address them jointly. In his first assignment of error, father argues the trial court erred when it did not conduct a new trial on remand. In his second assignment of error, father argues the trial court failed to apply the clear and convincing evidence standard in making its best interest determination and that the trial court's decision was against the manifest weight of the evidence. In his third assignment of error, father argues the trial court erred when both of the successor judges assigned to the case did not properly incorporate the findings of or proceedings before the predecessor judges. Though father phrases some of these arguments as a violation of his due process rights, we construe his assignments of error more generally as a challenge to the procedure employed by the trial court during the remand proceedings.

{¶ 15} "It is axiomatic that an inferior court lacks jurisdiction to depart from a superior court's mandate." *State ex rel. AWMS Water Solutions, L.L.C. v. Mertz*, 2024-Ohio-200, ¶ 19, citing *State ex rel. Heck v. Kessler*, 72 Ohio St.3d 98, 104 (1995). "A trial court is without authority to extend or vary the mandate given." *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 2024-Ohio-5729, ¶ 20, citing *Nolan v. Nolan*, 11 Ohio St.3d 1, 4 (1984), and *Giancola v. Azem*, 2018-Ohio-1694, ¶ 16. The determination of whether a trial court followed a superior court's mandate presents a jurisdictional question that we review de novo. *Id.*, citing *Smith v. Ohio State Univ.*, 2024-Ohio-764, ¶ 11.

{¶ 16} Though father argues the trial court deprived him of due process when it did not conduct a new trial, our remand instruction did not require the trial court to conduct a new trial. In the first appeal, we determined the trial court made factual misstatements prejudicial to father, and we reversed and remanded the matter to the trial court on that basis. *D.R.*, 2023-Ohio-539, at ¶ 39. Our instruction on remand was for the trial court "to properly analyze the R.C. 2151.414(D)(1) best interest factors *in light of the evidence contained in the record*." (Emphasis added.) *Id.*

{¶ 17} There are circumstances in which reversal of a permanent custody judgment requires a new hearing. For example, a new hearing would be required where an appellate

court either mandates the trial court hold a new hearing or reverses the permanent custody judgment based on errors that occur during the trial court proceedings. *In re K.T.*, 2017-Ohio-2638, ¶ 20 (9th Dist.). However, "[r]eversal of a permanent custody decision solely because of errors in the trial court's factual findings does ***not necessarily*** require the trial court to hold a new permanent custody hearing." (Emphasis added.) *Id.* at ¶ 21, citing *In re Arnold*, 2006-Ohio-2794, ¶ 8 (3d Dist.) (where "only the trial court's factual findings were defective," a new hearing is not required and the trial court on remand can make the proper findings based on the prior evidence already in the record).

{¶ 18} Here, the remand instruction did not mandate a new hearing. Our remand instruction specifically directed the trial court to make its findings under R.C. 2151.414(D)(1) based on the evidence contained in the record. In such circumstances, the trial court is in the best position to determine whether a new hearing is necessary or whether it can issue proper findings based on the evidence already in the record. *K.T.* at ¶ 22 (where the remand instructions do not specifically require a new hearing on remand, "the trial court [is] in the best position to determine" whether it could issue proper findings under R.C. 2151.414(D)(1) "based on the evidence that it had already heard").

{¶ 19} As noted above, the parties discussed with the trial court on two separate occasions whether it needed to gather new evidence to reach a decision regarding D.R.'s best interest. The trial court never formally ruled on whether it would conduct another evidentiary hearing before issuing its final decision. More generally, an appellate court reviews a trial court's decision to admit or exclude relevant evidence in a permanent custody case for an abuse of discretion. *In re D.W.*, 2015-Ohio-3205, ¶ 11 (10th Dist.), citing *State v. Angus*, 2006-Ohio-4455, ¶ 16 (10th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983); *State ex rel. Deblase v. Ohio Ballot Bd.*, 2023-Ohio-1823, ¶ 27. Accordingly, we review the trial court's decision not to gather any new evidence on remand for an abuse of discretion.

{¶ 20} Though we agree with FCCS that our remand instruction in the first appeal did not ***require*** the trial court to conduct a new trial, we are nonetheless troubled by the trial court's decision not to gather any new evidence under these specific circumstances.

The reality of appellate procedure is that matters do not move swiftly when appealed from an inferior tribunal, reversed, remanded, and reactivated on the trial court's docket. Though we do not fault the trial court for the delay, we cannot escape the fact that more than two years had passed since the trial court last heard the matter. While the evidence in the record from the trial before Judge Preisse is undoubtedly still relevant to the best interest determination, so, too, would evidence related to the time after Judge Preisse's October 2021 trial.

{¶ 21} The trial court's decision not to gather any new evidence becomes even more problematic when reviewing the analysis of D.R.'s best interest contained in the trial court's November 20, 2023 decision and entry. The remand instruction did not require the trial court to conduct a new hearing, but it did require the trial court to properly analyze the best interest factors. We are unable to discern from the trial court's terse, perfunctory decision whether it properly engaged in the required best interest analysis.

{¶ 22} In making its first four findings under R.C. 2151.414(D)(1)(a) through (d), the trial court stated only that Judge Preisse had "fully analyzed . . . and made the appropriate findings" related to subsections (a) through (d) and that the trial court "considered" the previous analysis from the November 29, 2021 decision. (Nov. 20, 2023 Decision and Entry at 3-4.) The trial court did not make any independent findings or conduct any independent analysis with respect to R.C. 2151.414(D)(1)(a) through (d). It was only under R.C. 2151.414(D)(1)(e) that the trial court omitted any reference to the prior findings of Judge Preisse. There, the trial court found "R.C. 2151.414(E)(10) is applicable in the present case" as "[f]ather abandoned [D.R.] by going longer than 90 consecutive days without contact," noting father admitted he did not contact D.R. during the year and a half he was homeless. (Nov. 20, 2023 Decision and Entry at 4.)

{¶ 23} Though the trial court stated it "carefully reviewed the testimony and evidence presented, the entire file, and the applicable law," the analysis of the R.C. 2151.414(D) best interest factors does not reflect that the trial court independently determined the credibility and weight of the evidence in the record before making its own specific findings relative to each R.C. 2151.414(D)(1) factor. (Nov. 20, 2023 Decision and Entry at 5.) With respect to R.C. 2151.414(D)(1)(a) through (d), the trial court simply stated the predecessor judge had made the appropriate findings. Only with respect to R.C.

2151.414(D)(1)(e) did the trial court depart from its wholesale deference to the predecessor judge, making a finding related to R.C. 2151.414(E)(10).

{¶ 24} It was under Judge Preisse's analysis of R.C. 2151.414(D)(1)(e) that the November 29, 2021 entry contained erroneous factual findings, thereby necessitating our remand in the first appeal. However, as we explained in the first appeal, though the location of the erroneous factual finding was limited to that factor, the impact of the erroneous factual findings went beyond that factor such that we could not determine whether and to what extent the erroneous findings affected the trial court's ultimate best interest determination. *D.R.*, 2023-Ohio-539, at ¶ 36 ("[w]hile we cannot assess with certainty the degree to which the incorrect findings influenced the court's ultimate decision, we share in father's concern regarding the negative impact the findings at issue may have had on the court's analysis"). Of note, we find it hard to separate Judge Preisse's consideration of a legally secure placement under R.C. 2151.414(D)(1)(d) from the erroneous factual determinations specifically deemed by Judge Preisse to be relevant to her consideration of D.R.'s best interest. Given our concern in the first appeal that the erroneous factual findings affected the entire best interest analysis, each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e) required independent consideration and analysis by the trial court on remand demonstrating how the appropriate, relevant factual determinations factored into the trial court's ultimate decision.

{¶ 25} The trial court found "[D.R.] is thriving in a prospective adoptive home with his biological siblings which can provide stability to meet his behavioral issues and mental health needs" and ultimately concluded permanent court commitment ("PCC") was in D.R.'s best interest. (Nov. 20, 2023 Decision and Entry at 5.) However, the trial court did not discuss or include any findings related to either D.R. or father from the more than two years between the October 2021 trial and the November 20, 2023 decision and entry on remand. Neither the trial court's individual findings under each best interest factor nor its single paragraph in the "conclusion" section finding PCC would be in D.R.'s best interest provide enough specificity or demonstrable consideration of the evidence for this court to properly evaluate the trial court's decision granting permanent custody. Just as we could not determine in the first appeal whether and to what extent the erroneous factual findings impacted the best interest determination, we similarly are unable to determine from the

trial court's November 20, 2023 decision and entry whether permanent custody was in D.R.'s best interest ***at the time of the remand proceedings***.

{¶ 26} As to father's argument that the trial court erred when Judge Preisse proceeded to a new trial without incorporating or acknowledging the proceedings before Judge Jamison, we note father did not raise this issue in the proceedings before Judge Preisse. It was not until the first appeal that father, for the first time, asserted an argument related to Judge Preisse's handling of the proceedings that occurred before Judge Jamison. This argument was the subject of father's third assignment of error in the first appeal, but, having already determined we must remand the matter because of erroneous factual findings, we concluded that assignment of error was moot. *D.R.*, 2023-Ohio-539, at ¶ 40. Now on appeal from the remanded proceedings, father again raises his argument that Judge Preisse erred in her handling of the proceedings after succeeding Judge Jamison. However, father's failure to raise this argument during the proceedings before Judge Preisse forfeits this argument for purposes of appeal. *Nunn v. Ohio Dept. of Ins.*, 2018-Ohio-4030, ¶ 11 (10th Dist.), citing *Simmons v. Budde*, 2015-Ohio-3780, ¶ 10 (10th Dist.) ("It is well-established that a party may not present new arguments for the first time on appeal"); *In re D.K.*, 2020-Ohio-5251, ¶ 39 (10th Dist.), quoting *In re J.L.*, 2016-Ohio-2858, ¶ 59 (10th Dist.) (" 'Generally, this court will not in the first instance consider errors that the appellant could have called to the trial court's attention' "). Even if we were to consider this argument, we note father does not articulate any prejudice stemming from Judge Preisse conducting new proceedings as father was able to fully participate in those proceedings, present evidence, and cross-examine witnesses.

{¶ 27} We do note, however, that father's argument related to the trial court's succession of Judge Preisse is relevant to our review of the matter as a whole. Civ.R. 63(B) governs the disability of a judge after a verdict or findings and provides:

> If for any reason the judge before whom an action has been tried is unable to perform the duties to be performed by the court after a verdict is returned or findings of fact and conclusions of law are filed, another judge designated by the administrative judge, or in the case of a single-judge division by the Chief Justice of the Supreme Court, may perform those duties; but if such other judge is satisfied that he cannot perform those duties, he may in his discretion grant a new trial.

Pursuant to Civ.R. 63(B), a successor judge has discretion to determine whether to grant a new trial. *See Elsnau v. Weigel*, 5 Ohio St.3d 77, 78 (1983). An appellate court reviews a successor trial court judge's decision whether to conduct a new trial for an abuse of discretion. *Id.*

{¶ 28} As we have explained above, though the trial court was not required to conduct a new trial, the trial court did not satisfy its obligation on remand to engage in a complete analysis of D.R.'s best interest. Simply stated, given the incompleteness of the record related to D.R.'s and father's circumstances since October 2021, coupled with the passage of time since the first trial, the trial court could not–and did not–adequately consider and determine D.R.'s best interest at the time of the remand proceedings. From this record, then, we are unable to discern on appeal whether permanent custody to FCCS remains in D.R.'s best interest nearly four years after the trial court's initial decision granting permanent custody.

{¶ 29} Thus, when considering all of the trial court's actions together–the failure to gather new evidence related to D.R.'s and father's circumstances after October 2021, the failure to explain why the trial court did not believe it needed to consider any new evidence before rendering its decision, the failure to independently evaluate and weigh the evidence already in the record, and the failure to independently analyze each of the best interest factors with due consideration for the passage of time since the first trial–we are compelled to conclude the trial court abused its discretion in its handling of the matter on remand.

{¶ 30} We are mindful of the desire not to cause further delay in these permanency proceedings, especially given the length of time this matter has persisted in both the trial court and on appeal. At the time of drafting, almost four years have passed since the trial court last heard any evidence on the best interest factors, a period that accounts for a significant portion of D.R.'s life. Both the record and the decision and judgment entry on remand leave us unable to evaluate whether clear and convincing evidence supports a grant of permanent custody to FCCS. Reluctantly, therefore, we must reverse the judgment of the trial court and remand the matter for the trial court to (1) determine whether it can adequately assess the credibility and weight of the evidence from the trial before Judge Preisse and, in its discretion, gather new evidence relevant to that timeframe where it

cannot adequately assess the credibility and weight of the evidence already in the record, (2) gather evidence related to D.R.'s and father's circumstances from the time of October 2021 onward, and (3) properly and thoroughly engage in the required best interest analysis. Given that even more time has now elapsed since the trial court's November 20, 2023 decision and entry, we instruct the trial court to consider all the evidence in the record and gather new evidence to account for the entire period of time from October 2021 until it reaches its decision on remand. For these reasons, we sustain father's first, second, and third assignments of error.

## V. Fourth Assignment of Error–Motion for In Camera Interview

{¶ 31} In his fourth and final assignment of error, father argues the trial court erred in ruling on FCCS's motion for permanent custody without first ruling on father's motion for an in-camera interview of the child. Because we have already determined in our resolution of father's first three assignments of error that we must remand the matter to the trial court with instructions to gather new evidence, this assignment of error is moot, and we need not address it. *Dunn v. Dunn*, 2025-Ohio-584, ¶ 19 (10th Dist.), citing *Croce v. Ohio State Univ. Bd. of Trustees*, 2024-Ohio-2138, ¶ 67 (10th Dist.), citing *State v. Gideon*, 2020-Ohio-5635, ¶ 26 ("an assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by an appellate court"), and App.R. 12(A)(1)(c) (an appellate court must decide each assignment of error "[u]nless an assignment of error is made moot by ruling on another assignment of error").

## VI. Disposition

{¶ 32} Based on the foregoing reasons, the trial court abused its discretion in its handling of the permanent custody proceedings on remand leaving it unable to satisfy its obligation to engage in a complete analysis of whether granting permanent custody to FCCS is in D.R.'s best interest. Having sustained father's first, second, and third assignments of error, rendering moot his fourth assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, and remand the matter to that court for further proceedings consistent with this decision.

*Judgment reversed; cause remanded.*

BEATTY BLUNT and DINGUS, JJ., concur.

_____