[Cite as *L.G. v. R.G.*, 2026-Ohio-258.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

L.G.,                                                    :

    Plaintiff-Appellant,                   :

                                No. 115041

v.                                                       :

R.G.,                                                    :

    Defendant-Appellee.                    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 29, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-15-359284

---

### *Appearances:*

Rosenthal | Lane, L.L.C., Scott S. Rosenthal, and Alarra S. Jordan, *for appellant*.

McCarthy, Lebit, Crystal & Liffman Co., L.P.A., Richard A. Rabb, and Jenna C. Sholk, *for appellee*.

MARY J. BOYLE, P.J.:

{¶ 1} Plaintiff-appellant L.G. ("Mother") appeals from the Cuyahoga County Domestic Relations Court's post-decree judgment adopting the magistrate's

decision modifying parental rights and responsibilities and support and ordering Mother to pay defendant-appellee R.G.'s ("Father") attorney fees. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} Mother and Father were married in Israel in May 2002 and had six children together.[1] In February 2017, the parties were divorced. At the time of their divorce, they resided in University Heights, Ohio. In their final divorce decree, Mother was designated sole custodian and residential parent of all six children with visitation allotted to Father.

{¶ 3} In 2019, the parenting order was modified because Father planned to move to Texas. The parties entered into a shared parenting plan wherein custody of the oldest child went to Father, and Mother had visitation, while the five younger children remained with Mother and Father had visitation four weeks a year in the city where Mother resided. The parties also agreed that Mother could relocate to any location she desired, including to Israel, with 30 days advanced notice to Father. (Agreed J.E., Nov. 18, 2019.)

{¶ 4} Following the modification, Father had some visitation with his children but no overnight visits. In early May 2022, Father contacted Mother to schedule his end-of-June visitation with the minor children. Mother, however,

---

[1] N.G. (emancipated in 2021), R.G. (emancipated in 2022), S.G. (emancipated in 2025, during these proceedings), R.G. (born in 2008), M.G. (born in 2012), and A.G. (born in 2016). The four youngest are the subject of this appeal and will be referred to as the "middle two children," the "younger two children," or collectively as the "minor children."

instructed Father to cancel his trip because it interfered with her trip to Israel with the children. Mother did not advise Father when they were leaving on their trip. Then on Tuesday, May 31, 2022, Father learned through an acquaintance that one of his children told friends and school staff that she and her family were spending the rest of the year in Israel. That same day, Father contacted Mother via Our Family Wizard ("OFW") to confirm her plans and inquire how he could contact the children while they were out of the country.[2] Because Mother did not respond in a timely fashion, Father filed a motion for an ex parte temporary restraining order ("TRO") to prohibit Mother from leaving with the children. Additionally, he filed a motion requesting the court to order Mother return the children to the United States. Both motions were filed on Friday, June 3, 2022.

{¶ 5} On Monday, June 6, 2022, the trial court granted the TRO restraining Mother from removing the minor children from the jurisdiction of the court without prior consent of Father. Mother, however, had already departed for Israel with the children where they have remained throughout this litigation.

{¶ 6} On August 15, 2022, despite the TRO being granted, Mother filed a notice of intent to relocate the children to Israel effective August 27, 2022. Father then filed on September 12, 2022, a motion to modify parental rights and responsibilities, or in the alternative, motion to modify companionship schedule. The motion was set for trial on October 21, 2022. Because the parties requested a

_____

[2] OFW is a coparenting platform used by parents in a divorce.

guardian ad litem ("GAL") be appointed for the minor children, the trial date was rescheduled to June 2023.

{¶ 7} Throughout the litigation, numerous motions were filed by both parties, including Mother's motion to show cause and motion for attorney fees, alleging Father failed to comply with certain financial obligations, and Father's motion for attorney fees and motion to modify child support and terminate spousal support.

{¶ 8} The June trial date was again continued at the request of the parties because the GAL was unable to obtain medical and academic records for the minor children. On the rescheduled trial date, Mother filed a motion to dismiss Father's motion to modify custody alleging that the trial court lacked subject-matter jurisdiction because none of the parties reside in Ohio. Thereafter, Father filed a response and on August 28, 2023, the court held a hearing on Mother's motion.

{¶ 9} On September 18, 2023, the magistrate issued a decision denying Mother's motion to dismiss for lack of subject-matter jurisdiction. Mother filed timely objections. Father filed a brief in opposition to Mother's objections. The trial court overruled Mother's objections on November 22, 2023, and adopted the magistrate's decision on November 27, 2023.

{¶ 10} The next day, trial ensued via Zoom before the magistrate on the following motions: Father's motion to return children to the United States, Father's motion to modify parental rights, Father's motion for attorney fees, Father's motion to modify support, and Father's motion to apportion GAL fees (filed June 22, 2023).

In addition, the court heard Mother's motion to apportion GAL fees (filed July 25, 2023) and Mother's motion for attorney fees (filed July 28, 2023). However, Mother's motion to show cause and motion for attorney fees filed in November 2022 were not before the court.

{¶ 11} At trial, Mother, Father, and the GAL testified. Additionally, the parties' attorneys testified as to their fees. At the outset we note that Mother's testimony was tedious and often nonsensical. The record also reflects that she was deliberately evasive, rambled incessantly, feigned ignorance, and had to be instructed repeatedly and continuously by the magistrate to answer the questions posed. Also, when Father's attorney complained about Mother's theatrics throughout trial, the court noted for the record that Mother, although muted, was "chirping the entire time. . . . [I]t's been going on the entire proceeding." (Nov. 29, 2023, tr. 98.)

{¶ 12} That being said, Mother testified that she departed for Israel with the children on "May 31st. Maybe June 1[, 2022.]" (Nov. 28, 2023, tr. 29.) She explained that they went to Israel for a family wedding and decided to stay for the summer. She admitted that Father sent her messages via OFW on May 31, inquiring as to whether she went to Israel, how long she planned to stay, and how he could contact the children. She testified that she did not respond until June 7, 2022, when she viewed the messages. She admitted that she did not answer any of his questions and did not provide a way to contact the children. Nevertheless, she repeatedly blamed Father for the lack of communication with the children.

{¶ 13} Mother also testified that she would only check OFW occasionally to respond to Father's messages. When questioned, she replied that she could not remember if she contacted Father after the terrorist group Hamas attacked Israel on October 7, 2023, to let Father know the children were safe. She stated that she rarely, if ever, initiated contact with Father. Mother made it clear that she did not think she should be required to facilitate a relationship between Father and the children. In addition, Mother felt that Father could determine which Israeli schools the children were enrolled in and contact the schools directly. She also felt Father could ascertain which of the four medical carriers provided care for his children, despite Father not having the children's Israeli identification numbers.

{¶ 14} When questioned about the minor children's mental-health diagnoses, Mother denied any of the children had mental-health challenges. In addition, she did not feel follow-up treatment was necessary.

{¶ 15} Regarding her notice of intent to relocate that was filed August 15, 2022, Mother testified that Father was aware in advance that she planned to relocate to Israel with the children. However, she also testified that she did not make the decision to remain in Israel until August or September when she was able to enroll the minor children in an Israeli school. She asserted that "I would have loved to give [Father] 30-day notice had it happened like that. And yes, it makes my court case look bad. However, there's truth here and there's reality here." (Nov. 28, 2023, tr. 45.) Mother went on to explain that the middle two children had been expelled from their orthodox school in Ohio and they were unable to find another orthodox

school in Ohio that would enroll them.  She claimed the middle two children were expelled because Father failed to pay the tuition.  The evidence, however, revealed that they were expelled from school for excessive absences, tardies, and the failure to complete assignments.  To further that point, the evidence established that Mother and the children departed for Israel two weeks before the school year ended.

{¶ 16} When Father testified, he confirmed Mother's testimony that they had very little communication through OFW or otherwise.  He testified that when he attempted to exercise his weeks of visitation, Mother often thwarted his plans.  He explained that Mother prioritized the children's extracurricular activities, religious holidays, and her animosity towards Father over his relationship with the children and the agreed visitation schedule.  In a two-year period, Mother cancelled Father's visitation two out of eight times citing Jewish holidays and an aviation award Mother was to receive.  This did not include Mother's cancellation of Father's summer 2022 visit because of her "trip" to Israel that is the subject of this appeal.

{¶ 17} Father testified that on May 31, 2022, he was contacted by the children's school via email and was informed that the children were leaving school that day and moving to Israel.  He testified that he messaged Mother to inquire why they were leaving before the end of the school year, when they would return, and how he could contact the children in the interim.  When Mother did not respond in a timely fashion, he filed the TRO and motion to return the children.  He testified that when Mother finally responded on June 7, 2022, she informed him that she and the children were in Israel for the summer.  Mother did not provide any contact

information for Father to speak with his children. He testified that she did offer to pay the difference in flight prices in order for Father to visit the children in Israel. Father testified that he declined Mother's offer because Mother has a history of calling the police on him and her new husband. He did not want to risk false accusations in Israel.

{¶ 18} Father also testified that he was unable to communicate with his children from May 31, 2022, until June 2023 because Mother would not provide a contact number for the children. He explained that he did not have a phone number for Mother either, only her WhatsApp and OFW. He stated that communication only resumed with his children because the magistrate got involved. Father also testified that Mother would not provide him with information regarding the children's schooling or medical coverage. In fact, it was not until Mother testified that Father learned which medical insurance company in Israel is providing care to his children.

{¶ 19} Father testified that the middle two children were expelled from school because of their poor attendance and failure to complete assignments. He explained that he made himself available to speak with the school on several occasions before the expulsion, but Mother would never make herself available. Father admitted that he was behind on tuition payments, but he testified that Jewish schools have a policy that children will not be expelled for financial reasons.

{¶ 20} Father explained that because of Mother's actions, he has no relationship with two of his children and a tenuous relationship with one of his other

children.  He stated that he has a decent relationship with the youngest two children and they speak on a weekly basis.  Father testified that it is in the youngest two children's best interest to live with him and his new wife.  He asserted that he would provide proper medical care and make certain the children are educated.  He feared that if the youngest two children remained with Mother, they would be uneducated and completely alienated from Father like the other children.  Father further testified that because of the age of the middle two children and the severe alienation, he felt that reunification therapy was required.

{¶ 21} In addition, Father testified that, although Mother alienated the eldest child from Father and the child could barely read or write when he obtained custody, under his care, his eldest child graduated from high school and completed online university.  Notably, when Mother spoke of her oldest child she stated that after she allowed the oldest child to have a two-week visitation with Father, the oldest child no longer wanted to live with Mother.  She lamented that their relationship was damaged by that visitation.

{¶ 22} The GAL recommended that the trial court modify the parenting designations to shared parenting despite neither parent requesting such.  He recommended that Father's parenting time take place initially in Ohio and then eventually Texas after the relationship between Father and the minor children were repaired.  The GAL recommended that the children remain with Mother in Israel and that Father travel to Israel for two visits a year.  He recommended that Mother facilitate a relationship between Father and the minor children.  Nevertheless, he

testified that "I'm very concerned about how things are presently. I'm very concerned about how things were previously and I'm very concerned about whether Mother can honor any agreement going forward in a way that would facilitate a relationship between the children and their Father." (Nov. 30, 2023, tr. 181-182.) He stated that "it [is] pretty clear that it was not a priority for Mother to facilitate a relationship with their Father." (Nov. 30, 2023, tr. 182.)

{¶ 23} After trial, the magistrate issued a decision on January 12, 2024, granting Father's (1) motion to return children to the United States, (2) motion to modify parental rights and responsibilities, (3) motion for attorney fees, and (4) motion to modify support; and denying (1) Father's motion to apportion GAL fees, (2) Mother's motion to apportion GAL fees, and (3) Mother's motion for attorney fees. Mother filed timely objections. Father filed a brief in opposition to Mother's objections. The trial court overruled Mother's 17 objections on May 23, 2024; however, the trial court vacated the order requiring Mother to pay Father $26,000 for spousal support overpayment. Mother appealed. This court dismissed for lack of final appealable order. Then on March 25, 2025, the trial court adopted the magistrate's decision as modified by separate entry. Mother now appeals, raising the following assignments of error for review:

**Assignment of Error I:** The trial court lacked jurisdiction over the proceedings, and as such, its orders are void *ab initio*.

**Assignment of Error II:** The trial court erred and abused its discretion in modifying custody.

**Assignment of Error III:** The trial court erred and abused its discretion in modifying support.

**Assignment of Error IV:** The trial court erred in ordering [Mother] to pay all of [Father's] attorney fees, in the amount of $66,000.00.

## II. Law and Analysis

### Standards of Review

{¶ 24} Generally, we review a trial court's determinations in a domestic relations case under an abuse-of-discretion standard. *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989). A trial court abuses its discretion when it exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.). Furthermore, there is no abuse of discretion where the record contains competent, credible evidence to support the trial court's decision. *A.E. v. J.E.*, 2024-Ohio-2644, ¶ 26 (8th Dist.). Nevertheless, whether a court has jurisdiction is a question of law that we review de novo, and we afford no deference to the trial court's decision. *Cleveland v. Kutash*, 2013-Ohio-5124, ¶ 8 (8th Dist.).

### Jurisdiction

{¶ 25} In Mother's first assigned error, she argues that the trial court lacked subject-matter jurisdiction over the parties because the parties and the children do not reside in Ohio, citing R.C. 3127.16. She contends that when the magistrate determined that Mother and the children reside in Israel and Father resides in Texas, the trial court no longer had jurisdiction over the proceedings. (Mag.

Decision, Sept. 18, 2023, adopted by the trial court in J.E. Nov. 27, 2023.) We find Mother's argument unpersuasive.

{¶ 26} R.C. 3127.16 states in pertinent part that

a court of this state that has made a child custody determination . . . has *exclusive, continuing jurisdiction* over the determination until the court or a court of another state determines that the child, the child's parents . . . do not presently reside in this state.

(Emphasis added.)

{¶ 27} In *V.R.T. v. Celebrezze*, 2019-Ohio-2339, ¶ 7 (8th Dist.), this court addressed whether the trial court had jurisdiction under R.C. 3127.16 to entertain a motion to modify visitation, which was filed in the underlying divorce case, when the parties no longer resided in Ohio. This court held that "[o]nce Ohio has obtained jurisdiction, it retains continuing jurisdiction, even if the parties no longer reside in Ohio, as long as no other court has asserted jurisdiction over the parties." *Id.* at ¶ 7.

{¶ 28} Likewise, other districts have also concluded that Ohio retains continuing jurisdiction under R.C. 3127.16, even if none of the parties live in Ohio, so long as no other state has asserted jurisdiction. For example, in *Mulatu v. Girsha*, 2011-Ohio-6226 (12th Dist.), the Twelfth District explained that once jurisdiction is vested in Ohio courts, "R.C. 3127.16 simply sets forth the terms under which Ohio no longer has *exclusive* jurisdiction. In other words, R.C. 3127.16 sets forth the proposition that it is possible that an Ohio court is not the only court/state with jurisdiction. However, the statutory principle does not strip the Ohio trial court from continuing jurisdiction[.]" (Emphasis added.) *Id.* at ¶ 45. Similarly in

*Johnson v. Kelly*, 2015-Ohio-2666 (10th Dist.), the Tenth District stated that if none of the parties reside in Ohio, and if "another court has not indicated an intent to take jurisdiction, R.C. 3127.16 does not completely deprive an Ohio court of jurisdiction but merely deprives it of 'exclusive' jurisdiction." *Id.* at ¶ 16. Finally in *Robinette v. Bryant*, 2013-Ohio-2889, ¶ 1 (4th Dist.), the Fourth District explained that "R.C. 3127.16 does not totally divest a trial court of jurisdiction if the parties move out of state; rather the court only loses its claim to exclusive jurisdiction."

{¶ 29} Although none of the parties reside in Ohio in the case at bar, it is undisputed that no other court has asserted jurisdiction over the parties. In fact, the parties stipulated that no other court has asserted jurisdiction over the parties, and as we stressed in *V.R.T.*, "there must be a forum to determine the welfare of the children." *V.R.T.* at ¶ 7, citing *Mulatu* at ¶ 45. Therefore, after reviewing the record and the relevant law, we find that the trial court has continuing jurisdiction to address the matters at hand.

{¶ 30} We turn now to Mother's argument that the trial court did not have jurisdiction to modify parental rights and responsibilities. She contends jurisdiction was expressly limited to a modification of visitation schedule because Mother filed her notice of intent to relocate pursuant to R.C. 3109.051(G)(1), which only gives the trial court jurisdiction to modify visitation. R.C. 3109.051(G)(1) states:

> If the residential parent intends to move to a residence other than the residence specified in the parenting time order or decree of the court, the parent shall file a notice of intent to relocate with the court that issued the order or decree. . . . [T]he court shall send a copy of the notice to the parent who is not the residential parent. Upon receipt of

the notice, the court, on its own motion or the motion of the parent who is not the residential parent, may schedule a hearing with notice to both parents to determine whether it is in the best interest of the child to revise the parenting time schedule for the child.

{¶ 31} Mother cites numerous cases alleging that Ohio courts have held that once Mother filed her notice to relocate, the trial court was essentially stripped of its authority to modify parental rights and responsibilities and could only address visitation. A review of the cases cited, however, does not support Mother's contention.[3] Although courts have held that R.C. 3109.051(G)(1) does not grant the court authority to prohibit relocation, none of the cases cited support Mother's assertion that the trial court may only address visitation when motions to modify

---

[3] *Zinnecker v. Zinnecker*, 133 Ohio App.3d 378 (12th Dist. 1999)(reversing the denial of mother's motion to modify custody because relocation to another state with father, under the facts of this case, was a substantial change in circumstances that warranted a review of whether it was in the best interest of the child to modify custody); *Valentine v. Valentine*, 2012-Ohio-426 (12th Dist.)(finding that relocation alone was not a change of circumstances); *In re Noble*, 2001 Ohio App. LEXIS 1563 (11th Dist. Mar. 30, 2011)(The trial court denied father's motion to modify custody but prohibited mother from moving. The appellate court held that R.C. 3109.051(G)(1) does not give the trial court the authority to prevent the residential parent from relocating.); *Acus v. Acus*, 2010-Ohio-856 (12th Dist.)(reversing the trial court's denial of mother's motion to relocate finding that R.C. 3109.051(G)(1) does not grant the trial court authority to prevent mother from relocating absent a prior agreement stating otherwise); *Randolph v. Britt*, 2012-Ohio-4433 (9th Dist.)(reversing the denial of mother's motion to relocate and modify visitation explaining that because the trial court denied father's motion to modify custody the trial court must address whether a modification of the parenting schedule would serve the best interest of the child, and the trial court could not prohibit relocation); *Kassavei v. Hosseinipour*, 2001 Ohio App. LEXIS 2490 (11th Dist. June 1, 2001)(reversing the denial of mother's notice to relocate and remanding for further proceedings to implement a visitation schedule); *Spain v. Spain*, 1995 Ohio App. LEXIS 2678 (3d Dist. June 21, 1995)(reversing the denial of mother's motion to relocate and remanding the case to address the visitation schedule); *Ross v. Ross*, 2012-Ohio-2175 (9th Dist.)(affirming the trial court's decision permitting mother to relocate and denying additional visitation to father explaining that the trial court did not have authority to prohibit relocation of the residential parent, only adjust the visitation schedule).

parental rights and responsibilities are also pending before the court. In the instant case, Father's motion to modify parental rights and responsibilities, or in the alternative, a motion to modify companionship schedule was in fact pending before the court. Therefore, we find Mother's argument regarding R.C. 3109.051(G)(1) unpersuasive. We conclude that the trial court had jurisdiction to address Father's pending motion to modify parental rights and responsibilities.

{¶ 32} Accordingly, Mother's first assignment of error is overruled.

## Modification of Parental Rights and Responsibilities

{¶ 33} In Mother's second assignment of error, she argues that it was an abuse of discretion to modify parental rights and responsibilities because Father failed to show a change of circumstances and that it was in the best interest of the children to change custody. In addition, she argues he failed to overcome the presumption that the harm likely caused by the change outweighed the advantages. She also disagrees with the trial court's findings that Mother absconded with the children to Israel, obstructed the GAL's investigation, engaged in parental alienation, and failed to provide for the children's health and education.[4]

{¶ 34} R.C. 3109.04(E)(1)(a) governs the modification of a prior decree allocating parental rights and responsibilities. It states, in pertinent part:

---

[4] Mother's argument that the visitation schedule is not practical will not be addressed in this appeal because Mother failed to raise the argument in the trial court. Indeed, it has long been held that "[a] party who fails to raise an argument in the court below waives his or her right to raise it [on appeal]." *State ex rel. Zollner v. Indus. Comm. of Ohio*, 66 Ohio St.3d 276, 278 (1993), citing *State ex rel. Gibson v. Indus. Comm.*, 39 Ohio St.3d 319 (1988).

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

. . .

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

R.C. 3109.04(E)(1)(a)(iii).

{¶ 35} Accordingly, before reallocating parental rights and responsibilities, the court must first consider whether a change of circumstances has occurred. Although the statute does not define "change in circumstances," it is generally held that a change of circumstances is "an event, occurrence, or situation which has a material and adverse effect upon a child." *Rohrbaugh v. Rohrbaugh*, 136 Ohio App.3d 599, 604-605 (7th Dist. 2000). The change of circumstances must be "one of substance, not a slight or inconsequential change," but the change need not be substantial. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

{¶ 36} Here, Mother contends that Father agreed she could relocate with the children to Israel; therefore, he cannot use the move as a change of circumstances. Furthermore, she argues that relocation alone is not sufficient to constitute a change of circumstances citing *Valentine*, 2012-Ohio-426, ¶ 13 (12th Dist.). While we agree

with Mother that relocation alone is not sufficient to constitute a change in circumstances, relocation may be a factor in such a determination. *Zinnecker*, 133 Ohio App.3d at 384. Furthermore, in the instant case, Father argued that the "relocation without notice appears sporadic and without thought and consideration to the best interest of the children." (Father's Motion to Modify Parental Rights, Sept. 12, 2022.) Additionally, Father argued that Mother had alienated the children from Father. The trial court agreed that Mother had successfully alienated Father from his children since the prior decree. In fact, the trial court did not even rely on the relocation to Israel to establish a change of circumstances. The trial court stated that

> a change of circumstances has occurred since the November 15, 2019 Agreed Judgment Entry. The Magistrate found that [Mother] did not adequately address the children's education and health needs. Further, the Magistrate found that [Mother] alienated the children from [Father]. As evidence, the Magistrate lists several examples from after November 15, 2019 of [Mother] failing to address the children's mental health issues and of the children missing or being tardy to school. Finally, the Magistrate cited to the GAL's investigation and report which found that [Mother] was inappropriately involving the children in issues between the parties.

(J.E. May 23, 2024.) Therefore, Mother's argument regarding relocation improperly being used as a change of circumstances is not supported by the record.

{¶ 37} We turn now to Mother's argument that the trial court's findings of alienation and failure to adequately care for the children's health and education are unfounded. She contends that because these findings are unfounded there is no

evidence of a change of circumstances; therefore, the modification of parental rights and responsibilities was an abuse of discretion.

{¶ 38} Contrary to Mother's assertion, the record contains competent, credible evidence that she alienated the children from Father by repeatedly cancelling Father's scheduled visitation when they lived in Ohio. In addition, the evidence established that Mother departed for Israel with the children without informing Father and refused to provide contact information so Father could communicate with his children. In fact, according to Father's uncontested testimony he was unable to speak with his children for over a year, and communication only resumed when "the Magistrate got involved, and there was an agreement that was reached." (Nov. 29, 2023, tr.24.) Also, Mother refused to inform Father regarding the children's health and education instead expecting Father to somehow ascertain which healthcare provider and schools the children attended in Israel. Considering the foregoing, we find that the record supports the trial court's finding that Mother alienated the children from Father since the prior decree in 2019.

{¶ 39} We also find that the record contains competent, credible evidence that Mother failed to adequately care for the children's health and education. The evidence established that two of the children have diagnosed mental-health disorders that are not being treated properly, and one child needs a mental-health assessment. In addition, two of the children have undiagnosed developmental disabilities that are not being addressed. Finally, all four of the children have a

shocking number of absences from school ranging from 25 days to 50 days in any given year, which does not include the dozens of tardies each year. In fact, the trial court found that Mother's negligence concerning the middle two children's attendance solely contributed to the children being expelled from their orthodox school in Ohio. Based on the foregoing, we find that the record supports the trial court's finding that Mother failed to adequately care for the children's health and education since the prior decree.

{¶ 40} Because Mother alienated the children from Father and failed to adequately care for the children's health and education, we conclude that there is competent, credible evidence of a change of circumstances since the prior decree in 2019. Accordingly, the trial court's finding was not an abuse of discretion.

{¶ 41} Having found Father proved a change of circumstances, we now address Mother's argument that Father failed to prove that a modification of parental rights and responsibilities was in the children's best interest. Mother contends that the trial court erred in finding that Father was more likely to act in the children's best interest, complaining that she was unfairly expected to keep Father informed of the children's health and education. We find Mother's arguments unpersuasive.

{¶ 42} R.C. 3109.04(F)(1) sets forth a nonexhaustive list of factors a trial court must consider when determining the best interest of the children. Importantly, the best-interest determination focuses on the children, not the parents. *In re N.B.*, 2015-Ohio-314, ¶ 59 (8th Dist.).

**{¶ 43}** Contrary to Mother's assertion, the trial court considered the relevant factors delineated in R.C. 3109.04(F)(1) when determining the best interest of the children. Specifically, the judgment entry reflects that the trial court considered the following factors:

> (a) The wishes of the child[ren's] parents regarding the child[ren's] care;
>
> . . .
>
> (c) The child[ren's] interaction and interrelationship with the child[ren's] parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child[ren's] adjustment to the child[ren's] home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
>
> (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
>
> . . .
>
> (i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
>
> (j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1). (Mag. Decision, Jan. 12, 2024.)

**{¶ 44}** After addressing the relevant factors, the trial court concluded that it was in the best interest of the children to modify parental rights and responsibilities.

The decision was primarily based on Mother's continuous and willful conduct that alienated the children from Father, as well as Mother's complete failure to address the children's mental health and school attendance.

{¶ 45} After reviewing the record, we find that it was not an abuse of discretion for the trial court to conclude that it was in the children's best interest to modify parental rights and responsibilities. As previously stated, the evidence clearly demonstrates that Mother alienated the children from Father and did not adequately care for the children's health and education. Moreover, we agree with the trial court's conclusion that "if the children remain with [Mother] the children will suffer further developmental delays and will be further alienated from [Father]." (J.E., May 23, 2024.) Additionally, Mother's argument that she was unfairly expected to keep Father updated regarding the children's health and education is irrational. Naturally, when Mother moved the children 6,000 miles away to another country it is fair for Father to expect, and the court to conclude, that Mother should have kept Father informed of the children's health and education.

{¶ 46} Mother also asserts that Father agrees that the middle two children should remain with Mother. We disagree with Mother's characterization of the situation. It was only because of Mother's actions, which resulted in the extreme alienation of the middle two children against Father, that he requested custody of the younger two children and a modification of the visitation schedule with the middle two children to initiate reunification therapy. Nevertheless, the trial court concluded that

> [d]espite the acrimony that [the middle two children] have toward Father, leaving them with Mother would only cause further developmental damage for [the middle two children]. . . . Add in Mother's alienation of the children against Father and her purposeful withholding of basic, legally entitled information from Father and you produce four children who will grow up to be unprepared for life's challenges and possess great difficulty at sustaining relationships in their own lives. . . . The Court entrusted Mother to look out for the best interest of the children, but Mother only focused instead on what was in her best interest.

(Mag. Decision, Jan. 12, 2024.) We agree with the trial court's conclusion that Mother's conduct was so extreme and the risk to the children's well-being so great that it would be better for the middle two children to live with Father and their siblings than to remain in Mother's custody. As a result, we find that the trial court did not abuse its discretion by finding that it was in the best interest of the children to modify parental rights and responsibilities.

{¶ 47} Next, Mother argues that the harm likely to be caused by the change of environment is outweighed by the advantages of the change of environment for the children. Ironically, the crux of Mother's argument is that changing schools would be detrimental to the children's well-being, when Mother failed to prioritize her children's education in Ohio, as well as in Israel. After a thorough review of the record, we conclude that the evidence clearly establishes that remaining in Mother's custody would be detrimental to the children's education, mental health, and relationship with Father. Therefore, the trial court did not abuse its discretion by finding that the harm did not outweigh the advantages.

{¶ 48} Finally, Mother claims the trial court's findings that she absconded with the children and that she obstructed the GAL's investigation are not supported by the record. A thorough review of the record, however, clearly establishes that Mother has been anything but cooperative and forthcoming with Father, the court, or the GAL.

{¶ 49} The evidence reflects that Mother departed for Israel with the children prior to the end of the school year without notifying Father. Then when Father learned through the children's school that Mother planned to stay in Israel with the children, he contacted Mother and she failed to respond. While awaiting a response, Father was forced to file a TRO and a motion to return the children to the United States. The trial court granted the TRO; however, Mother had already absconded to Israel. To date, Mother has not returned with the children despite the court order. Therefore, we find that there is competent, credible evidence to support the finding that Mother absconded with the children.

{¶ 50} Furthermore, the testimony of the GAL supports the trial court's finding that Mother obstructed the investigation. The GAL testified that over the course of ten months there were over a dozen instances of noncompliance by Mother. He indicated that Mother delayed providing the children's contact information, medical records, and school records, which are the foundations of his investigation. In fact, the original trial date was rescheduled because Mother still had not provided medical and academic records six months after the GAL's request. In addition, when Mother finally provided some of the information, it was on the

eve of trial and in Hebrew. Therefore, we find that the trial court's conclusion that Mother obstructed the GAL's investigation is well-founded.

{¶ 51} Because Father established that there was a change of circumstances since the November 15, 2019 A.J.E., that it was in the best interest of the children to modify parental rights and responsibilities, and the advantages of the change outweighed the harm, we find that the trial court did not abuse its discretion by modifying parental rights and responsibilities.

{¶ 52} Accordingly, Mother's second assignment of error is overruled.

### Modification of Support

{¶ 53} In Mother's third assignment of error, she argues that the trial court erred in (1) terminating her spousal support, (2) imputing income to Mother, (3) and ordering Mother to pay child support.[5] We disagree.

{¶ 54} Initially, Mother asserts that the trial court abused its discretion by terminating spousal support when Father failed to pay for the children's extracurricular activities. She argues that her show-cause motion should have been considered when terminating support. We note that she cites no law to support her contention. Furthermore, Mother's argument is nonsensical because her show-cause motion was not before the trial court and the children's extracurricular activities are not covered under spousal support. Moreover, in the November 15, 2019 A.J.E. the parties agreed to extend Mother's spousal support for 12 months at

---

[5] Mother's argument regarding the trial court's order of a cash bond was not properly raised below and will not be addressed on appeal.

$2,000 a month, which was to expire on December 31, 2022. Father waited until January 18, 2023, to file the motion to terminate spousal support, even though Mother remarried in March 2022, which should have terminated spousal support as stated in the original divorce decree. (J.E. Feb. 15, 2017). Based on the foregoing, we find that the trial court did not abuse its discretion by terminating spousal support.

{¶ 55} Next, Mother contends that she is not voluntarily unemployed or underemployed because she is a stay-at-home mom; therefore, the trial court wrongfully imputed a minimum wage income to her without considering her circumstances. She contends that she should not owe child support for her children. We find Mother's arguments unpersuasive.

{¶ 56} When issuing an order of child support, the trial court "shall calculate the amount of the parents' child support and cash medical support in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119." R.C. 3119.02. To calculate the amount of child support owed, the trial court must first determine the annual income of each parent. *Ayers v. Ayers*, 2024-Ohio-1833, ¶ 13. "Income" is defined in R.C. 3119.01(C)(10) and means either of the following:

(a) For a parent who is employed to full capacity, the gross income of the parent;

(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent.

"Potential income" for a parent who is voluntarily unemployed or voluntarily underemployed includes "[i]mputed income that the court . . . determines the parent would have earned if fully employed." R.C. 3119.01(C)(18)(a).

{¶ 57} To determine the potential income for a parent who the court finds is voluntarily unemployed or voluntarily underemployed, the court assesses the following factors:

(i) The parent's prior employment experience;

(ii) The parent's education;

(iii) The parent's physical and mental disabilities, if any;

(iv) The availability of employment in the geographic area in which the parent resides;

(v) The prevailing wage and salary levels in the geographic area in which the parent resides;

(vi) The parent's special skills and training;

(vii) Whether there is evidence that the parent has the ability to earn the imputed income;

(viii) The age and special needs of the child for whom child support is being calculated under this section;

(ix) The parent's increased earning capacity because of experience;

(x) The parent's decreased earning capacity because of a felony conviction;

(xi) Any other relevant factor.

R.C. 3119.01(C)(18)(a)(i)-(xi). Thus, when calculating a parent's potential income, the trial court must make two specific determinations. "First, the court must determine that a parent's unemployment or underemployment was voluntary."

*Ayers* at ¶ 14. "Second, the court must determine what the parent would have earned if fully employed." *Id.*

{¶ 58} In the instant case, the record established that Mother is a stay-at-home-mom and has not been employed outside the home since 2013 by choice. She is remarried and receives financial assistance from her new spouse. In addition, Mother testified that she was previously employed as a teacher in a Hebrew school in Ohio, and prior to that, she managed approximately 250 workers at Olatex, a large manufacturing company in Israel. She also testified that she obtained her pilot's license and finished her degree in psychology in 2019. "Further, [Mother] is a healthy, 43-year-old woman who has the ability to earn a reasonable wage." (J.E. May 23, 2024.)

{¶ 59} Based on the foregoing, we find that the trial court's decision to impute Mother's income at minimum wage is hardly unconscionable in light of Mother's education and abilities. We further find that ordering Mother to pay a total amount of $231.50 plus 2% processing charge in child support for her four children is not an abuse of discretion because the trial calculated the child support in accordance with the basic child support schedule and applicable worksheet. Indeed, it must be remembered that the purpose of child support is to meet the needs of the minor children, and the trial court has broad discretion when determining how to meet those needs. *Carnes v. Kemp*, 2004-Ohio-7107, ¶ 10.

{¶ 60} Accordingly, Mother's third assignment of error is overruled.

**Attorney Fees**

{¶ 61} In Mother's fourth assignment of error, she contends that the trial court erred by ordering Mother to pay Father's attorney fees without considering Mother's ability to pay. In addition, she contends that the award of $66,000 is so high that it shocks the conscience. Finally, Mother asserts that the trial court improperly relied on the belief that Mother absconded with the children to Israel and obstructed the GAL's investigation. Again, we find Mother's arguments unpersuasive.

{¶ 62} In post-decree divorce proceedings, a court may award all or part of reasonable attorney fees and litigation expenses to either party if the court finds the award equitable. R.C. 3105.73(B); *Allan v. Allan*, 2019-Ohio-2111, ¶ 95 (8th Dist.). In determining whether such an award is equitable, R.C. 3105.73(B) states that "the court *may* consider the parties' income, the conduct of the parties, and any other relevant factors the court deems appropriate, but it may not consider the parties' assets." (Emphasis added.) The decision to award attorney fees under R.C. 3105.73 lies within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Allan* at ¶ 95, citing *Huffer v. Huffer*, 2010-Ohio-1223, ¶ 19 (10th Dist.).

{¶ 63} Contrary to Mother's argument, R.C. 3105.73(B) does not require the trial court to consider either party's income when awarding attorney fees and an award of attorney fees can be equitable without any such consideration. *Coomes v. Coomes*, 2020-Ohio-3839, ¶ 14 (12th Dist.). Moreover, the statute permits the trial

court to consider other relevant factors, including the conduct of the parties, when ordering attorney fees. Here, the record is replete with instances of Mother's attempt to thwart and prolong the proceedings, including, but not limited to, absconding to Israel, failing to return the children, filing an untimely notice to relocate, failing to cooperate with the GAL's investigation, and filing a motion to dismiss for lack of jurisdiction on the eve of trial, not to mention Mother's utter disregard for the truth when testifying. We also note the restraint Father displayed by not filing numerous motions to compel that were clearly warranted by Mother's behavior. Based on the foregoing, we cannot say the court abused its discretion when ordering attorney fees.

{¶ 64} Accordingly, Mother's fourth assignment of error is overruled.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
KATHLEEN ANN KEOUGH, J., CONCUR